EILEEN J. EVERTSON WILLIE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BRUCE F. EVERTSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Willie v. Commissioner
Docket Nos. 25465-88, 25904-88
United States Tax Court
T.C. Memo 1991-182; 1991 Tax Ct. Memo LEXIS 209; 61 T.C.M. (CCH) 2475; T.C.M. (RIA) 91182; April 25, 1991, Filed *209 Decision will be entered for the petitioner in docket No. 25904-88. Decision will be entered under Rule 155 in docket No. 25465-88. David A. Ludtke, for the petitioner in docket No. 25465-88. Terry R. Wittler, for the petitioner in docket No. 25904-88. Matthew J. Fritz and Ronald M. Frykberg, for the respondent. SHIELDS, Judge. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION In docket No. 25465-88 of these consolidated cases, respondent determined deficiencies in the income taxes of petitioner Eileen J. Evertson Willie (hereinafter Willie) for 1980 and 1983 in the respective amounts of $ 2,630 and $ 24,101. In docket No. 25904-88, respondent determined deficiencies in the income taxes of petitioner Bruce F. Evertson (hereinafter Evertson) for 1980 and 1983 in the respective amounts of $ 18,892.30 and $ 14,906.60. Petitioner Willie has conceded that, as determined by respondent, she received alimony in the amount of $ 900 in 1983 which was not reported on her 1983 return. Therefore, the only issue remaining for decision is which petitioner is required to report in 1983 certain undistributed taxable income of Evertson Oil and Gas Well Service, Inc., a subchapter *210 S corporation. FINDINGS OF FACT Petitioners and respondent have entered into a stipulation of facts and a supplemental stipulation of facts. The facts set forth therein are found accordingly and, together with the attached exhibits, are incorporated herein by reference. Willie was a resident of Littleton, Colorado, at the time she filed her petition. Evertson was a resident of Kimball, Nebraska, at the time he filed his petition. Petitioners were married in 1969 and apparently lived as man and wife until about January 12, 1982, when a petition for the dissolution of their marriage was filed by Willie in the District Court for Kimball County, Nebraska. On January 27, 1982, a stipulation was filed by Willie and Evertson in the divorce proceeding in which they mutually agreed upon such matters as temporary alimony, temporary custody and control of their two children, the payment of attorney fees and filing costs, and the payment of debts incurred after the petition was filed. They also agreed that each party would be temporarily enjoined by the district court from damaging, destroying, or alienating any property owned or controlled by either of them except in the normal course *211 of business. On June 11, 1983, a divorce decree which incorporated the above stipulation was entered by the district court. However, the district court retained jurisdiction to determine at a subsequent date the division of marital property. In all subsequent proceedings concerning the property settlement, Willie was represented by attorneys Vincent Dowding and Thomas Brower. Throughout such proceedings she also received accounting and tax advice from Gary Fitch, a certified public accountant and a member of the firm of Larsen, Schroeder & Associates. In all such proceedings Evertson was represented by attorneys Randal Nielsen and Paul Galter. During such proceedings he also received accounting and tax advice from Daniel E. Matthews, a certified public accountant. In the early part of March of 1983 a pretrial was scheduled by Judge Nap of the district court with respect to the division of the marital property. During the pretrial Judge Nap apparently became disturbed about the amount of time which had been consumed by the parties without arriving at a property settlement agreement. In the presence of their counsel he told Evertson and Willie "You get this property divided *212 up, or I am going to take a meat ax to it." During or shortly after the pretrial Judge Nap determined the date the valuation of the marital property was to be made and directed the parties to arrive at an agreement with respect to its division or he would do so at a trial which was scheduled for July 24, 1983. After the pretrial, counsel for the parties undertook to determine the property included in the marital estate and its value by exchanging interrogatories, depositions, tax returns, financial statements, appraisals, and other similar information. They also made arrangements for the accountants representing the respective parties to meet and exchange any and all information which they had on the marital assets including stocks in closely held corporations. On different occasions during this process, settlement of the property division was unsuccessfully attempted by representatives of both parties. The marital assets included shares of stock in closely held corporations which Evertson had organized over the years to do remedial work on oil and gas wells. Evertson had started working in oil and gas fields as a roustabout while a sophomore in high school and by March of 1983 *213 he controlled directly or indirectly seven corporations all of which were engaged in some form of such work. Two of the corporations, Evertson Well Service-Wyoming, Inc. (hereinafter Well Service-Wyoming) and Evertson Oil and Gas Well Service, Inc. (hereinafter Oil and Gas) were Wyoming corporations. The other five were Nebraska corporations. They were Evertson Well Service, Inc. (Well Service-Nebraska); Evertson Oilfield Rental, Inc.; Triangle Trucking, Inc.; E & K Threading, Inc.; and Echo Trucking, Inc. Evertson had organized Echo Trucking but prior to 1983 he had given all of its stock to the employees of Well Service-Nebraska. Oil and Gas had been organized in 1978. Upon its organization Evertson had caused its stock to be issued as follows: 11,250 shares to Evertson; 11,250 shares to his brother-in-law, Robert D. Cannon, who at that time had been working with Evertson for several years and who was already the holder of 17 percent of the outstanding stock in Well Service-Wyoming; 1,250 shares to Daniel Matthews, the full-time accountant, secretary, and comptroller of Oil Service; and 1,250 shares to Larry Halstead, a rig supervisor for Well Service-Wyoming. The operations *214 of all seven of the above corporations were carried on by employees of Well Service-Nebraska which had offices in Kimball, Nebraska; Rock Springs, Wyoming; and Evanston, Wyoming. The main office, at Kimball, was under the supervision of Evertson and Daniel Matthews. Robert Cannon was in charge of the day to day operations of the office in Rock Springs and Larry Halstead was in charge of a small satellite office in Evanston. Arlene Meredith, a sister to Willie, also worked in the office at Rock Springs with their brother Robert Cannon. In addition to the above closely-held stocks, a personal residence, its furniture and fixtures, and various other personal property such as automobiles and a Cessna airplane, the marital estate included several thousand shares of stock in publicly-traded energy companies such as Gulf Energy Corporation, Trek Exploration Company and Trans-World Energy Corporation. In an attempt to arrive at a property settlement, a conference was arranged apparently by one of Evertson's lawyers for June 23, 1983, in Grand Island, Nebraska, at the office of Vincent Dowding, one of the attorneys for Willie. The conference lasted all day. It was attended by Evertson *215 and one of his lawyers, Paul Galter, as well as by Daniel Matthews, the comptroller of Oil and Gas, who was at the conference to advise Evertson with respect to accounting and taxes. Willie was also present together with her brother, Robert D. Cannon, her lawyers, Tom Brower and Vincent Dowding, and her accountant, Gary Fitch. The conference was held on June 23 because Judge Nap had agreed to be available on June 30, 1983, for the approval of any settlement agreement reached by the parties prior to that date. From the beginning of the conference it was understood by all parties that: (1) Willie wanted Evertson's 11,250 shares of stock in Oil and Gas as part of her share of the marital estate because she needed either a substantial cash settlement or an asset which would produce cash for her in the future without any provision for alimony; (2) the marital estate did not contain sufficient cash to provide a cash settlement for Willie; (3) Oil and Gas had a substantial amount of cash on hand (about $ 245,000) and over the preceding years had annually produced from $ 75,000 to $ 125,000 with respect to the 11,250 shares of its stock owned by Evertson; and (4) in view of what was becoming *216 a bitter divorce and property settlement proceeding, it was no longer advisable for Evertson and Robert D. Cannon to remain as co-owners in closely held corporate businesses. In earlier negotiations Evertson had apparently resisted the inclusion of the Oil and Gas stock in Willie's share of the marital estate because up to about a week before June 23, 1983, Robert Cannon had indicated to Evertson that he (Cannon) wanted to remain neutral with respect to the settlement of the division of the marital property and wanted to remain in business with Evertson. However, shortly before the negotiations on June 23, 1983, Evertson realized that Cannon was no longer neutral and in spite of the fact that they "were partners in almost everything" Cannon "was going in the * * * direction" of Willie and "it was apparent that Rob [Cannon] and * * * [Evertson] could not get along any longer." Consequently, by the date of the conference on June 23, 1983, Evertson and his representatives were also convinced that the Oil and Gas stock should be in Willie's share. As described by Mr. Galter the negotiations on June 23, 1983, with regard to the division of the marital estate proceeded as follows: *217 It [Oil and Gas] was the main subject discussed, initially * * * I think as a preliminary agreement, * * * Mrs. Evertson would own Oil and Gas. And that was the result of some general discussions about the fact that she needed money, income. And her brother was already involved in Oil and Gas. And ultimately one of the first things that we agreed upon was that, as part of our settlement, she would own Oil and Gas. There were some other properties that we agreed upon at that meeting, also. * * * There were many, many, many issues. * * * The parties owned not only interests in half a dozen operating corporations, but they had a home, they had rental properties, they had stocks, they had some interests in some oil wells, producing wells. One issue that arose involved some hunting property, where the Evertsons only had a partial interest. There was a Wilson lease, I believe, that involved some acquisitions by Mr. Evertson after the divorce had been granted, * * * Mrs. Evertson had a need for income. Which, from our perspective, we wanted to provide for her without alimony. * * * In all of the discussions, we wanted to complete the transactions on or before June 30, which *218 was the end of their [Oil and Gas'] fiscal year. * * * My understanding [at the end of the day] was, that we had a settlement, we had an agreement. [It] had not yet been reduced to writing, but we had an agreement. And that we were scheduled for a trial [on] June 30. When I say "trial," I am really talking in terms of a hearing before a judge where we, an uncontested hearing, where we [would] present our agreement to him, and him approve it. * * * I agreed to prepare the initial draft of a proposed property settlement agreement.
On the following day, June 24, 1983, Mr. Galter prepared a typewritten draft of the proposed property settlement agreement and forwarded copies of it to the other lawyers involved. Within the next two days he made a couple of typewritten changes to the draft at the suggestion of the lawyers for Willie. The changes were not substantial and did not affect the disposition of the Oil and Gas stock. Immediately after the conference on June 23, 1983, Evertson and Matthews went to the office of Oil and Gas and set aside all of the corporate records pertaining to both Oil and Gas as well as Well Service-Wyoming with the intention of delivering them to Willie *219 on June 30, 1983. On June 28, 1983, Evertson also endorsed over to Willie the certificate representing his 11,250 shares of stock in Oil and Gas and gave the certificate to Daniel Matthews, the corporation's secretary and comptroller. On the same date, June 28, 1983, Mr. Matthews at Evertson's direction prepared stock certificate #6 of Oil and Gas reflecting the issuance by Oil and Gas of 11,250 shares of stock to Willie. Although both the endorsement of the certificate surrendered by Evertson and the preparation by Matthews of certificate #6 occurred on June 28, 1983, the date of June 30, 1983, was used on both certificates because they were prepared in anticipation of the execution by the parties on June 30, 1983, of the property settlement agreement prepared by Mr. Galter and the approval of such agreement by Judge Nap. On or before June 30, 1983, Mr. Matthews made entries in the stock transfer ledger of Oil and Gas reflecting a cancellation of the 11,250 shares of stock previously held by Evertson and the issuance of an equal number of shares to Willie. After its preparation, stock certificate #6 was placed by Matthews with the other records of Oil and Gas which had been *220 set aside for delivery to Willie. Prior to endorsing his stock over to Willie on June 28, 1983, Evertson did not attempt to obtain the formal consent of the other stockholders to his transfer of the stock as required under a buy and sale agreement between the corporation and its stockholders. Evertson and Mr. Galter appeared with the property settlement agreement drafted by Mr. Galter at the hearing scheduled before Judge Nap at 10:00 a.m. on June 30, 1983. However, Willie and her representatives did not appear. Consequently, the agreement as originally drafted by Mr. Galter was not executed by the parties or approved by the district court. When it became apparent on June 30, 1983, that Willie was not going to execute the settlement which had been informally agreed to by all parties on June 23, 1983, Evertson, on the advice of Mr. Galter, attempted to maintain control over Oil and Gas and Well Service by telephoning Mr. Cannon in Rock Springs, Wyoming. When Evertson was unable to reach Cannon he talked by telephone with Arlene Meredith. In their conversation Evertson told Meredith that since Willie was apparently not going to agree to the property settlement, both Meredith and *221 Cannon were no longer employed by either Oil and Gas or Well Service. On the same day, June 30, 1983, Evertson also called Larry Halstead, the third stockholder in Oil and Gas, and told him he was going to "shut down" the operations of both corporations in Wyoming. On the following day, July 1, 1983, Willie applied to the district court for an increase in the temporary child support set forth in the stipulation of January 27, 1982, and for an order directing Evertson to show cause why he should not be held in contempt for violating the injunction incorporated into the divorce decree by discharging Cannon and Meredith and by threatening to shut down the Wyoming operations of Oil and Gas and Well Service. In opposition to Willie's application, Evertson filed with the district court on July 1, 1983, an affidavit in which he detailed reasons for having discharged Cannon and Meredith and for having told Halstead that he was going to shut down the Wyoming operations. The alleged reasons included: (1) A statement that to Evertson's knowledge Cannon had permitted considerable waste of corporate assets to occur in both corporations including the payment of exorbitant wages and salaries *222 to Cannon and Meredith but that Evertson had not taken action to correct such waste because of the pending property settlement in the divorce proceeding under which Willie was to receive his Oil and Gas stock; and (2) a statement that since Willie failed to appear at the hearing on June 30, 1983, it was no longer apparent that the settlement would be executed and that Willie would receive such stock. During the following week, Mr. Galter was able to salvage the property settlement agreement by making a few changes which he interlined by hand into the original typewritten draft. The first change appears with respect to the household goods and furnishings as reflected in paragraph 2H in the final draft and the elimination of paragraph 3J in the original draft. This change apparently amounts to nothing more than giving all of the household goods and furnishings to Willie rather than dividing them between the parties. The second change appears on page 3 of the agreement where the ownership of the parties' interest in the so-called "Hunting Ground" is transferred from Evertson to Willie. The transfer is accomplished by moving this property from paragraph 3 which represents Evertson's *223 share of the marital property to paragraph 2 which represents Willie's share. The record fails to disclose the value of this property but it consists of a one-third interest in certain hunting land located in Garden County, Nebraska. Willie received the property subject to a pro rata share of all "liens, debts, and encumbrances thereon" and agreed to pay the same. The inclusion of this property in the marital estate had been in dispute since it was acquired by Evertson after the divorce was granted. The fourth change in the agreement appears in paragraph 3I on page 4 where any accumulations of rents or royalties on the interest of the parties in the Wilson State Oil and Gas Lease were to be equally divided as of June 11, 1982, the date of the divorce decree, rather than July 1, 1983, as provided in the original agreement. The fifth change is the removal of paragraph 4 on page 4 from the original agreement. In the original agreement it was stated in paragraph 4 that the parties understood and agreed that their interest in the Wilson State Oil and Gas Lease covered only 40 acres of a 200 acre tract but that Evertson had a disputed claim to an ownership interest in a lease covering *224 the other 160 acres in the tract. Paragraph 4 in the original further provided that if it was determined at a later date through negotiations or litigation that Evertson did in fact have an ownership interest in the balance of the tract, then such interest would be his separate property free and clear of any claim by Willie. In the final draft, paragraph 4 was removed in its entirety which would have caused any subsequent interest acquired by Evertson in his disputed claim to the balance of the tract to be equally divided by Willie and Evertson under paragraph 2E and 3E. The remaining changes to the agreement appear to be relatively insignificant and of no particular value. Both before and after the interlined changes, the agreement accomplished a separation of the co-ownership which had existed in Oil and Gas and Well Service-Wyoming by Evertson and Cannon. In fact, the agreement obviously reflects an attempt not only to place control of the two Wyoming companies in Willie and her brother Cannon and the control of the four Nebraska companies in Evertson, but the agreement also contains covenants by the owners of each group of corporations not to compete within the area of operation *225 of the other group of corporations. On July 8, 1983, the revised property settlement agreement with the handwritten interlineations made by Mr. Galter was executed by Willie and Evertson and approved by the district court. A copy of the agreement is attached hereto as Appendix A. Under the agreement Willie received the 11,250 shares of stock in Oil and Gas previously issued to Evertson. She also received his 6,375 shares of stock in Well Service-Wyoming. Under the agreement Evertson agreed to resign and to obtain Mr. Matthews' resignation as an officer and director of both corporations as of July 8, 1983. The agreement also provides that it was effective upon its approval by the district court. Immediately after the hearing on July 8, 1983, in which the property settlement agreement was approved by the district court, Evertson went with Gary Fitch, Willie's accountant, to the office of Oil and Gas and loaded all of the books, records, corporate seals, and other items relating to Oil and Gas and Well Service-Wyoming into a U-Haul trailer which Fitch delivered to Willie. Such records included the stock books of Oil and Gas and stock certificate #6 which had been prepared in *226 Willie's name by Mr. Matthews on June 28, 1983, but which bore the date of June 30, 1983. On July 1, 1981, Oil and Gas had elected to be taxed under Subchapter S of the Internal Revenue Code. It filed Forms 1120S for each of the years ended on June 30, 1982, and 1983. On July 13, 1983, August 22, 1983, and September 8, 1983, Oil and Gas issued checks in the respective amounts of $ 18,947.37, $ 18,947.37, and $ 36,638.26 to Willie pursuant to valid corporate resolutions. These checks represented payment to Willie of dividends totaling $ 74,533 which was the amount of the undistributed net income of the corporation as of June 30, 1983, represented by the 11,250 shares of Oil and Gas stock transferred from Evertson to Willie. Prior to January 4, 1984, Oil and Gas changed its corporate name from Evertson Oil and Gas Well Service, Inc. to Cannon Oil and Gas Well Service, Inc., as required under the property settlement agreement between Willie and Evertson. However, prior to the change of its corporate name, Oil and Gas joined with Well Service and filed a civil complaint against Evertson in the United States District Court for the District of Wyoming in which the plaintiffs sought *227 a money judgment against Evertson for both compensatory and punitive damages in excess of $ 10,000,000 for mismanagement of both Oil and Gas and Well Service prior to the property settlement agreement. Apparently in retaliation, Evertson on August 24, 1984, filed with the Kimball County District Court a petition to vacate or modify the property settlement agreement approved by the divorce court on July 8, 1983, because Willie had failed to disclose to the divorce court the claims which she allegedly had with respect to damages against Evertson. In his petition to the divorce court, Evertson alleged that prior to the entry of the order of July 8, 1983, approving the property settlement agreement, he was the owner of 11,250 shares of stock in Oil and Gas. On September 27, 1984, Evertson filed with the divorce court a motion to dismiss his petition to vacate or modify the order approving the property settlement agreement. On September 28, 1984, the divorce court granted his motion. Evertson subsequently filed a counter-claim against Cannon and Willie in the United States District Court for Wyoming in which he sought an accounting with respect to their management of Oil and Gas and *228 Well Service. In response to his counter-claim, Cannon and Willie contended that Evertson had conveyed away any and all interest he had in the two corporations "on or about June 30, 1983, and that he has no standing to seek an accounting." On or about September 15, 1983, Oil and Gas filed with respondent its Form 1120S for the fiscal year ended on June 30, 1983. The Form 1120S was prepared by Brent Stehlik, a certified public accountant, and a member of Larsen, Schroeder & Associates. The Form 1120S reflected Willie as a shareholder as of June 28, 1983, and included a Schedule K-1 for Willie showing that she acquired her shares on June 28, 1983, and that her share of the company's undistributed taxable income for that year was $ 74,533. The original Form 1120S also included a Schedule K-1 which reflected that as of June 28, 1983, Evertson's ownership of stock in the corporation was terminated. A copy of the Schedule K-1 was received by Evertson. On or about August 14, 1984, an amended Form 1120S for the year ended June 30, 1983, was filed with the Internal Revenue Service on behalf of Oil and Gas. The amended Form 1120S was prepared by Brent Stehlik. It was signed by him *229 on August 1, 1984. It contained amended Schedules K-1 for Willie and Evertson which reduced her share of the company's undistributed taxable income as of June 30, 1983, from $ 74,533 to zero and increased his share from zero to $ 74,533. Evertson did not receive a copy of the amended K-1 and the record contains no evidence that any officer, accountant, or other agent of Oil and Gas ever attempted to furnish him with a copy. On Schedule D of his individual 1983 income tax return, Evertson reported his disposition of 11,250 shares of stock in Oil and Gas. He also reported the disposition of his 6,375 shares of stock in Well Service. These dispositions were shown on his 1983 return as having occurred on July 8, 1983. Mr. Stehlik also prepared the 1983 individual income tax return for Willie. It was signed by him on August 24, 1984, and by Willie on October 3, 1984. Her individual return for 1983 was filed with respondent on October 15, 1984. It did not contain any part of the undistributed net income of Oil and Gas as of June 30, 1983. OPINION On brief Willie contends that the conduct of the parties clearly demonstrates that Evertson continued as the real and beneficial owner *230 of the 11,250 shares of stock in Oil and Gas until July 8, 1983; that it was the purpose and understanding of the parties that ownership of the 11,250 shares would be resolved only as an integral part of a final determination of the marital property rights which event did not occur until July 8, 1983; and that the entries on the stock transfer records of Oil and Gas and the creation in her name of the stock certificate prior to the end of the corporation's fiscal year are not determinative of real ownership for income tax purposes of the stock on June 30, 1983. Evertson contends that under the law of Nebraska Willie was the record owner of the 11,250 shares of stock in Oil and Gas on the last day of the corporation's fiscal year; and in the alternative, that for income tax purposes Willie was the beneficial owner of the stock on the last day of such year as reflected by the conduct of the parties both before and after June 30, 1983. On brief respondent agrees with Willie. The only issue in these consolidated cases is which of the two petitioners, Willie or Evertson, was the shareholder on the last day of the fiscal year of Oil and Gas which began on July 1, 1982, and ended on June *231 30, 1983. Since the fiscal year of Oil and Gas which ended on June 30, 1983, began before the effective date of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, the applicable code section is section 1373 as it was in effect prior to such act. At that time section 1373 read in pertinent part as follows: (a) GENERAL RULE. -- The undistributed taxable income of an electing small business corporation for any taxable year shall be included in the gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. (b) AMOUNT INCLUDED IN GROSS INCOME. -- Each person who is a shareholder of an electing small business corporation on the last day of a taxable year of such corporation shall include in his gross income, for his taxable year in which or with which the taxable year of the corporation ends, the amount he would have received as a dividend, if on such last day there had been distributed pro rata to its shareholders by such corporation an amount equal to the corporation's undistributed taxable income for the corporation's taxable year. For purposes of this chapter, the amount so included shall be treated as an *232 amount distributed as a dividend on the last day of the taxable year of the corporation.
In this case each petitioner claims that under section 1373(a) the other was the shareholder with respect to the 11,250 shares of stock in Oil and Gas on June 30, 1983, and is required to include in his or her income for the calendar year 1983 the $ 74,533 which is the portion of the corporation's undistributed taxable income on that date represented by the 11,250 shares of stock. Respondent agrees with Willie that the undistributed taxable income in dispute is taxable to Evertson. For the reasons hereinafter set out, we are satisfied that as of June 30, 1983, Willie was the beneficial owner of the 11,250 shares of stock in Oil and Gas and is required to report the $ 74,533 as income. First, as a general rule the question of whether a valid transfer of property, including corporate stocks, has been made on or before a given date for Federal income tax purposes is a question of fact. Wilson v. Commissioner, 560 F.2d 687, 690-691 (5th Cir. 1977), affg. a Memorandum Opinion of this Court. Secondly, as stated in Danenberg v. Commissioner, 73 T.C. 370, 390 (1979): *233 It is well established that for purposes of determining who is a shareholder under the provisions of subchapter S, beneficial ownership of the stock rather than technical legal title is controlling ( Hoffman v. Commissioner, 47 T.C. 218 (1966), affd. per curiam 391 F.2d 930 (5th Cir. 1968); Kean v. Commissioner, 51 T.C. 337 (1968), affd. on this issue 469 F.2d 1183 (9th Cir. 1972)), and the incidents of taxation are determined by the real ownership of the stock, and not where mere naked title lies (see Rupe Investment Corp. v. Commissioner, 30 T.C. 240 (1958), affd. 266 F.2d 624 (5th Cir. 1959); Stiefel v. Commissioner, 9 T.C. 576 (1947)). * * *
See also Ragghianti v. Commissioner, 71 T.C. 346, 349 (1978), affd. without published opinion 652 F.2d 65 (9th Cir. 1981), where we stated: By now it is well settled that record ownership of stock, standing alone, is not determinative in answering the question as to who is required to include in gross income any dividends attributable to such stock. Rather, beneficial *234 ownership is the controlling factor. Walker v. Commissioner, 544 F.2d 419 (9th Cir. 1976); Hoffman v. Commissioner, 47 T.C. 218, 233 (1966). * * *
Again in Pacific Coast Music Jobbers, Inc. v. Commissioner, 55 T.C. 866, 874 (1971), affd. 457 F.2d 1165 (5th Cir. 1972), we stated: A court must consider not only when the bare legal title passed but also when the benefits and burdens of the property, or the incidents of ownership, were acquired or disposed of in a closed transaction. * * * In deciding the question, the court looks to that party to the transaction who has the greatest number of the attributes of ownership. * * * If it is found from all the facts and surrounding circumstances that the parties intended an agreement to result in the sale of property, and the agreement transfers substantially all the accouterments of ownership, the transaction will be treated as a sale even though the parties intended the legal title should not pass until later. * * * Since courts cannot successfully conjecture as to the subjective intent of the parties, the objective evidence of intent provided by the *235 parties' overt acts must be relied upon.
From the record as a whole in this case and particularly from the portions thereof set forth in our findings, it is clear that during the conference which occurred on June 23, 1983, petitioners and their representatives agreed that all of Evertson's stock in Oil and Gas would be part of Willie's share of the marital estate. It is equally clear that this part of their agreement never changed even though the parties continued to bicker, negotiate, charge, and counter-charge for over a year. It is undisputed that immediately after the conference on June 23, 1983, Evertson and Mr. Matthews went to the office of Oil and Gas and set aside every corporate record having anything to do with Oil and Gas; that on June 28, 1983, Evertson endorsed the certificate representing his 11,250 shares of stock in the corporation and gave the certificate to Mr. Matthews, the secretary and comptroller of Oil and Gas, and directed him to cancel the same and prepare a new certificate in the name of Willie for the same number of shares; that pursuant to Evertson's direction Mr. Matthews cancelled Evertson's certificate and prepared certificate #6 reflecting the *236 issuance to Willie by the corporation of the 11,250 shares; that on or before June 30, 1983, certificate #6 was executed by Evertson as president of the corporation and by Matthews as secretary and placed by Matthews among the corporate records of Oil and Gas; and that the certificate remained with such records until they were picked up for Willie by her accountant Gary Fitch on July 8, 1983. It is also undisputed that beginning only five days later on July 13, 1983, and continuing on August 22, 1983, and September 8, 1983, Oil and Gas issued checks in the respective amounts of $ 18,947.37, $ 18,947.37, and $ 36,638.26 to Willie pursuant to valid corporate resolutions which checks represented the payment to Willie of a total of $ 74,533 being that portion of the undistributed net income of Oil and Gas as of June 30, 1983, which was represented by the disputed 11,250 shares of its stock; that on or about September 15, 1983, Oil and Gas filed with respondent a Form 1120S for the fiscal year ended on June 30, 1983, in which Willie was listed as being the shareholder with respect to the 11,250 shares from and after June 28, 1983; that on the Form 1120S Willie's share of the company's *237 undistributed taxable income for the year ended on June 30, 1983, was shown as being $ 74,533; that the Form 1120S included a Schedule K-1 which reflected that Evertson had no share of the corporation's undistributable taxable income for the year ended June 30, 1983, because as of June 28, 1983, Evertson's ownership of the stock in question had been terminated; and that on his individual return for 1983, Evertson reported that his ownership of stock in Oil and Gas had terminated on June 28, 1983. From all of the foregoing undisputed facts, we are satisfied that as of June 30, 1983, Willie, not Evertson, was the holder of the 11,250 shares of stock on the corporate books and records of Oil and Gas. See Pacific Coast Music Jobbers, Inc. v. Commissioner, supra; Estate of Maxcy v. Commissioner, 441 F.2d 192 (5th Cir. 1971); Marshall v. Commissioner, 57 F.2d 633 (6th Cir. 1932); Clarke v. Kelley, 19 F.2d 920, 921 (8th Cir. 1927). We are also satisfied that the conduct of Willie and Evertson both before and after June 30, 1983, clearly indicates that the parties and their representatives intended that *238 Willie was to have and enjoy the beneficial ownership of such stock from and after June 30, 1983. Wilson v. Commissioner, 560 F.2d 687, 690 (5th Cir. 1977). We conclude, therefore, that the undistributed taxable income in dispute is taxable to Willie. Rupe Investment Corp. v. Commissioner, 266 F.2d 624, 630 (5th Cir. 1959), affg. 30 T.C. 240 (1958). In reaching our conclusion we have also considered the undisputed fact that on or about August 14, 1984, an amended Form 1120S was filed with the Internal Revenue Service on behalf of Oil and Gas containing amended Schedules K-1 for Willie and Evertson which reduced her share of the company's undistributed taxable income for fiscal year 1983 from $ 74,533 to zero and increased his share of the undistributed taxable income from zero to $ 74,533. We, however, are unable to attribute any weight to the amended Form 1120S because: (1) It was not prepared until over a year after the disputed transaction occurred; (2) it was prepared by the same accounting firm which was admittedly employed to furnish Willie with accounting and tax advice during the negotiation of the property settlement *239 agreement; (3) it reports the disputed income in a manner directly contrary to the manner such income was reflected on the original Form 1120S which was prepared by the same accounting firm shortly after the disputed transaction occurred; (4) a copy of Evertson's amended K-1 as included in the amended Form 1120S was not delivered to him; (5) the amended Form 1120S was prepared at or about the same time the 1983 individual return for Willie was being prepared by the same accounting firm; and (6) under all such circumstances the amended Form 1120S appears to be an afterthought apparently prompted by the substantial amount of income tax reflected on an early draft of Willie's individual return for 1983 by the inclusion of the $ 74,533 of undistributed taxable income of Oil and Gas. Decision will be entered for the petitioner in docket No. 25904-88. Decision will be entered under Rule 155 in docket No. 25465-88. APPENDIX A IN THE DISTRICT COURT OF KIMBALL COUNTY, NEBRASKA
EILEEN J. EVERTSON, Petitioner, vs. BRUCE F. EVERTSON, Respondent. Case No. 5328 PROPERTY SETTLEMENT AGREEMENT THIS Property Settlement Agreement is made and entered into this 8 day of July, 1983, by *240 and between EILEEN J. EVERTSON, Petitioner in the above matter, hereinafter referred to as "Petitioner", and BRUCE F. EVERTSON, Respondent in the above matter, hereinafter referred to as "Respondent". WITNESSETH: WHEREAS, prior hereto under date of May 28, 1982, to be effective June 11, 1982, a Decree was entered herein dissolving the marriage between the parties and reserving for a future determination all matters relating to division of property, custody of minor children, and support; and WHEREAS, the parties hereto wish to enter into an agreement relative to all matters, pending and reserved, and to reduce such agreement to a written instrument. NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties hereby contract and agree as follows: 1. Each party shall have, own retain and possess his or her own clothing, jewelry, sporting equipment and other personal effects free and clear of any claim of the other. 2. Petitioner shall have as her sole and separate property, free and clear of any claim by Respondent, the following: A. All funds in checking and savings accounts and in certificates of deposit in the name of Petitioner. *241 B. All capital stock owned by the parties, or either of the them, in Evertson Well Service-Wyoming, a Wyoming corporation, the same being 6,375 shares of the issued and outstanding capital stock of said corporation. C. All capital stock owned by the parties, or either of them, in Evertson Oil & Gas Well Service, Inc., a Wyoming corporation, the same being 11,250 shares of the issued and outstanding capital stock of said corporation. D. All life insurance policies, pension plans, annuities or profit sharing plans now owned by or in the name of Petitioner. E. An undivided one-half ownership interest of the portion of the Wilson State Oil & Gas Lease now owned by Respondent, including one-half of all accrued and undistributed production to date. F. All oil royalties owned by Petitioner in her name only. G. All property, both real and personal, acquired by Petitioner after June 11, 1982. H. All household goods and furnishings. Located at 702 South Burg, Kimball, Nebraska. I. All ownership interest of the parties, or either of them, in the residence now jointly owned by the parties in Kimball, Nebraska, legally described as the North 94 feet of Lot Two *242 (2), Block One (1), Aldens Addition to the City of Kimball, Kimball County, Nebraska, but subject to the existing liens, debts and encumbrances against such real estate, all of which shall be assumed and paid by Petitioner. J. 40% of the capital stock owned by the parties in Gulf Energy Corporation, Trek Exploration Company and Trans-World Energy Corporation, the same being 10,120 shares of Gulf Energy stock, 59,930 shares of Trek Exploration stock, and 36,307 shares of Trans-World Energy stock. K. The 1978 Cadillac automobile now driven by and in possession of Petitioner. In this regard, Respondent agrees to pay the current repair bills owed in connection with said automobile. L. All ownership interest of the parties, or either of them, in the hunting ground legally described as Lot One (1) in Section 32, and Lots One (1) and Two (2) in Section 33, all in Township 17 North, Range 44 West of the 6th P.M., Garden County, Nebraska, together with all accretions owned or claimed in said land, the ownership interest of petitioner being a one-third interest in said property. Petitioner takes ownership of the foregoing property subject to her pro-rata share of the liens, debts *243 and encumbrances thereon and agrees to pay the same.
3. Respondent shall have as his sole and separate property, free and clear of any claim by petitioner, the following: A. All capital stock owned by the parties, or either of them, in Evertson Well Service, Inc., a Nebraska corporation, the same being 7,500 shares of the issued and outstanding capital stock of said corporation. B. All capital stock owned by the parties, or either of them, in Evertson Oil Field Rental, Inc., a Nebraska corporation, the same being 1,000 shares of the issued and outstanding capital stock of said corporation. C. All capital stock owned by the parties, or either of them, in Triangle Trucking, Inc., a Nebraska corporation, the same being 4,500 shares of the issued and outstanding capital stock of said corporation. D. All capital stock owned by the parties, or either of them, in E. & K. Threading, Inc., a Nebraska corporation, the same being 42,500 shares of the issued and outstanding capital stock of said corporation. E. An undivided one-half interest in the Wilson State Oil & Gas Lease now in the name of Respondent, including one-half of all accrued and undistributed production *244 to date. F. All ownership interest of the parties, or either of them, in the oil and gas leases now owned in the name of Respondent including the leases known as Nelson Ranches, Dolan Ranches, Keiser-Nelson, Jennings-Mockett, Dringman, Gannon, Forsling-Vavra, and the fractional interests in the oil and gas leases in the state of Oklahoma operated by the Rougeot Oil & Gas Company. G. All ownership interest of the parties, or either of them, in the Slama Prospect Override, located in the SW 1/4 of the NW 1/4 of Section 33, Township 15 North, Range 52 West, Cheyenne County, Nebraska, the same being a .001171875 revenue interest override, now owned in the names of both Petitioner and Respondent. H. 60% of the capital stock owned by the parties in Gulf Energy Corporation, Trek Exploration Company, and Trans-World Energy Corporation, the same being 15,180 shares of Gulf Energy stock, 89,896 shares of Trek Exploration stock, and 54,461 shares of Trans-World Energy stock. I. Except for the interest of the parties in the Wilson State Oil & Gas Lease, to be equally divided as provided herein, the Respondent shall have all other property both real and personal, acquired by him *245 from and after June 11, 1982.
5. It is understood and agreed that Evertson Well Service-Wyoming, a Wyoming corporation, owns 16,500 shares of the issued and outstanding capital stock of Evertson Well Service, Inc., and that Robert D. Cannon, brother of Petitioner, owns 3,750 shares of the issued and outstanding capital stock of Evertson Well Service-Wyoming. Petitioner agrees that she, and her brother, who, upon approval of this Property Settlement Agreement by the court, will be the sole and only stockholders of Evertson Well Service-Wyoming, will cause said corporation to sell and convey to Evertson Oil Field Rental, Inc., such 16,500 shares of Evertson Well Service, Inc., in exchange for the conveyance by Evertson Oil Field Rental, Inc. to Evertson Well Service-Wyoming, all ownership interest in the following personal property and equipment now in possession of Evertson Well Service-Wyoming in the state of Wyoming: A. A drilling rig known as Rig No. 4. B. A Cessna Turbo 210 II airplane, serial number 210-62273, N6276B. C. Two (2) pumps and one B.O.P. (such B.O.P. now located in Nebraska.) D. Three (3) substructures. E. Four (4) light plants. F. Four *246 (4) heaters. G. All other machinery, equipment and personal property, located in Wyoming, Exle, one cooper power swivel and respondent's choice of light plants.
6. Respondent covenants and agrees that he will not, directly or indirectly, either individually or through any corporation, partnership, joint venture, or other type of entity, engage in the well service business or any other business currently being operated by Evertson Well Service-Wyoming and Evertson Oil & Gas Well Service, Inc., or their successors and assigns for a period of ten (10) years from and after the date of this agreement, in the western portion of the state of Wyoming or in the states of Utah and Idaho within a radius of 500 miles of Rock Springs, Wyoming, but not east of the west extended line of Albany County, Wyoming. This covenant shall extend to not only the Respondent but to Robert D. Cannon, Petitioner's brother, and to Evertson Well Service-Wyoming and Evertson Oil & Gas Well Service, Inc. For the purpose of this covenant, the "western" part of Wyoming shall include that portion of the state of Wyoming west of the following Wyoming counties: Campbell, Converse and Albany. Respondent agrees *247 that he will not, alone or through others, directly or indirectly interfere with any business facets of Evertson Well Service -- Wyoming, and Evertson Oil and Gas Well Service, Inc., their successors and assigns. Petitioner agrees that she will not, directly or indirectly, either individually or in connection with Evertson Well Service-Wyoming, Evertson Oil & Gas Well Service, Inc., or her brother Robert D. Cannon, or otherwise, engage in the well service, business in the eastern part of the state of Wyoming & Colorado (the eastern part being east of the west borders of Campbell, Converse and Albany counties in Wyoming) or in the state of Nebraska for a period of ten (10) years from and after the date of this agreement. Petitioner agrees that she will secure a similar covenant from her brother, Robert D. Cannon. It is agreed that either of the parties hereto, or that Robert D. Cannon, Evertson Well Service, Inc., Evertson Well Service-Wyoming, Evertson Oil Field Rental, Inc., and Evertson Oil & Gas Well Service, Inc., may enforce this agreement by an injunction and shall also be entitled to damages or other remedies available at law or in equity. The covenants in this paragraph *248 six (6), shall be interpreted and governed under and pursuant to the laws of the state of Nebraska. 7. Respondent acknowledges that he has provided Petitioner with balance sheets for Evertson Well Service-Wyoming and Evertson Oil & Gas Well Service, Inc., for the period ended May 31, 1983. Respondent warrants and represents that said balance sheets are substantially correct and that accounts payable and accounts receivable are correctly stated therein and that there is currently cash on hand in Evertson Oil & Gas Well Service, Inc., the approximate sum of $ 245,000.00, (including a promissory note from Evertson Oil Field Rental, Inc., in the amount of $ 130,000.00 which will be paid in full by August 1, 1983). Although Respondent warrants the accounts receivable to be correctly stated in said balance sheets, he does not guarantee the collectibility of such accounts. 8. Petitioner agrees that she will take action to amend the corporate names of Evertson Well Service-Wyoming and Evertson Oil & Gas Well Service, Inc., within sixty (60) days after the date of this agreement, so that the name "Evertson" does not appear in said corporate names. In addition, Respondent agrees that *249 commencing sixty (60) days after the date of this agreement, the name "Evertson" shall not be used in connection with any trade names or enterprises operated by said corporations. 9. Respondent agrees to resign, forthwith, as an officer, director, agent or employee of Evertson Well Service-Wyoming and Evertson Oil & Gas Well Service, Inc. Respondent acknowledges that said corporations are not indebted to him in any manner for services rendered, expenses or costs advanced either as an officer, director, employee, or agent. 10. Respondent agrees that he will secure, forthwith, the resignation of Daniel Matthews as an officer and director of Evertson Well Service-Wyoming and Evertson Oil & Gas Well Service, Inc.
11. Petitioner acknowledges that none of the corporations operated by Respondent are indebted to her in any manner for any reason whatsoever, such corporations being Evertson Well Service, Inc., Evertson Oil Field Rental, Inc., Triangle Trucking, Inc., and E. & K. Threading, Inc. Petitioner agrees that she will take whatever action is necessary to sever any ties or relationships that she may have with said corporations. 12. Petitioner agrees that she has been receiving *250 from Respondent the sum of $ 1,400.00 per month, representing alimony in the sum of $ 900.00 per month and child support in the sum of $ 500.00 per month since the date of the temporary order herein, and Petitioner further agrees that she will sign and file with the Clerk of the District Court a receipt showing payment of all temporary and permanent alimony and child support owed to her by Respondent up to and including June 30, 1983. 13. Respondent agrees to pay and be individually liable for any and all debts owed by the parties, or either of them, prior to June 11, 1982. Respondent agrees to indemnify and hold Petitioner harmless from any and all such debts and obligations. This indemnification shall include, but not be limited to, any contingent liability of Petitioner together with any income tax liability, both state and federal, in connection with income tax returns for the year 1981 and prior years. Except as is otherwise specifically provided herein, each party shall assume, pay and be individually liable for any and all debts incurred by such party from and after June 11, 1982. Each party shall indemnify and hold the other harmless from any liability in connection *251 with such debts. 14. The parties shall jointly recommend to the Court that the custody of Edward Arnold Evertson, minor child of the parties, born July 7, 1970, be awarded to Petitioner subject to all reasonable rights of visitation by Respondent and that the custody of Julie Ann Evertson, minor child of the parties, born August 8, 1969, be awarded to Respondent subject to all reasonable rights of visitation by Petitioner. 15. Respondent agrees that Petitioner may remove said Edward Arnold Evertson from the jurisdiction of this Court to the state of Arizona, or such other state where Petitioner may reside, and in the event Petitioner makes application to the Court for the removal of such child, the Respondent shall not object to such application. 16. Respondent shall pay into the office of the Clerk of the District Court of Kimball County, Nebraska, for disbursement to Petitioner, child support in the sum of $ 250.00 per month, commencing July 1, 1983, and continuing on the first day of each month thereafter until such child marries, dies, enters the military service, becomes of legal age or is self-supporting. 17. Neither party shall pay alimony to or receive alimony from *252 the other. 18. Respondent shall pay the costs of this action. Each party shall pay his or her own attorney's fees. 19. Both parties shall sign and execute any and all deeds, titles, stock certificates, bills of sale, or other instruments necessary or convenient for the purpose of putting into effect any of the provisions of this Property Settlement Agreement, or an order or decree entered by the Court in accordance herewith. 20. This Property Settlement Agreement effective upon approval by the District Court of Kimball County, Nebraska, and upon approval shall be binding upon and shall inure to the benefit of the heirs, personal representatives, successors and assigns of the parties hereto. Dated at Kimball, Nebraska, this 8th day of July, 1983. Eileen J. Evertson, Petitioner Bruce F. Evertson, Respondent
STATE OF NEBRASKA
COUNTY OF KIMBALL
On this 8 day of July, 1983, there personally appeared before me, the undersigned Notary Public in and for said county, Eileen J. Evertson, known to me to be the identical person who executed the foregoing Property Settlement Agreement as Petitioner, and she acknowledged her execution thereof to be her voluntary act and deed. AGREEMENT *253 AND CONSENT OF ROBERT D. CANNON AND BRUCE F. EVERTSON
The undersigned, Robert D. Cannon, in consideration of the following agreements on the part of Bruce F. Evertson, Respondent, to-wit: 1. The covenant not to compete as set forth in paragraph six (6) of the foregoing Property Settlement Agreement. 2. The agreement to convey to Evertson Well Service-Wyoming certain personal property owned by Evertson Oil Field Rental, Inc., as set forth in paragraph five (5) of the foregoing Property Settlement Agreement. 3. The agreement to resign as an officer, director, employee and agent of Evertson Well Service-Wyoming and Evertson Oil & Gas Well Service, Inc., and to obtain the resignation of Daniel Matthews as an officer, director, employee and agent of such corporations, as set forth in paragraphs nine (9) and ten (10) of the foregoing Property Settlement Agreement, and he hereby acknowledges and agrees that neither of said corporations are indebted to him for wages, fees, commissions, expenses and costs advanced. 4. The warranties by Respondent as to the correctness of the balance sheets of Evertson Well Service-Wyoming and Evertson Oil & Gas Well Service, Inc. for the period *254 ended May 31, 1983 and for the cash on hand in Evertson Well Service-Wyoming, as set forth in paragraph seven (7) of the foregoing Property Settlement Agreement. and for other good and valuable consideration, the receipt of which is hereby acknowledged, does hereby covenant, contract and agree as follows: 1. That he agrees to be bound by all of the terms and conditions of the foregoing Property Settlement Agreement as they affect him, or Evertson Well Service-Wyoming and Evertson Oil & Gas Well Service, Inc., including the covenant not to compete; the conveyance of 16,500 shares of the capital stock of Evertson Well Service, Inc. to Evertson Oil Field Rental, Inc.; and the continued production of operating oil wells on the Wilson State leases through June 30, 1983. Robert D. Cannon agrees that he will not, alone or through others, directly or indirectly, interfere with any business facet of Evertson Well Service, Inc., Evertson Oil Field Rental, Inc, Triangle Trucking, Inc., and E. & K. Threading, Inc., their successors and assigns. 2. That he will, forthwith, resign as an officer, director, agent or employee of Evertson Well Service, Inc., Evertson Oil Field Rental, Inc., Triangle *255 Trucking, Inc., and E. & K. Threading, Inc., and he hereby acknowledges and agrees that none of said corporations are indebted to him in any manner for wages, fees, commissions, expenses or costs advanced. 3. That this agreement shall be binding upon and shall inure to the benefit of the heirs, personal representatives and assigns of Bruce F. Evertson, Respondent. Dated at Kimball, Nebraska, this     day of    , 1983. Robert D. Cannon