CABINTAXI CORPORATION, F.K.A. AUTOMATED TRANSIT, INC., ROBERT W. EDLER, TAX MATTERS PERSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cabintaxi Corp. v. Commissioner
Docket No. 27539-92
United States Tax Court
T.C. Memo 1994-316; 1994 Tax Ct. Memo LEXIS 323; 68 T.C.M. (CCH) 49; July 11, 1994, Filed *323 Decision will be entered for respondent. R issued notices of final S corporation administrative adjustment (FSAA) to CT for its 1984 and 1985 tax years. R determined that CT's S corporation election was invalid because not all of CT's shareholders consented to the election. Additionally, R disallowed CT's claimed deductions under secs. 162(a), 195, and 248, I.R.C., for 1984 and 1985. Held: CT's S corporation election was invalid because not all of CT's shareholders consented to the election. Held, further, CT is not entitled to its claimed deductions for 1984 and 1985, because CT was not carrying on a trade or business in those years. Robert W. Edler (tax matters person), pro se. For respondent: Lisa C. Smith and Jonathan P. Decator. NIMS
NIMS
MEMORANDUM FINDINGS OF FACTS AND OPINION NIMS, Judge: By notices of final S corporation administrative adjustment (FSAA), respondent determined that the S corporation election by Cabintaxi Corporation (Cabintaxi) was invalid. Additionally, respondent determined a $ 17,177.17 adjustment to Cabintaxi's 1984 tax year and a $ 19,044.85 adjustment to its 1985 tax year. Both adjustments were the result of the disallowance of business *324 expense deductions (pursuant to section 162)(a)) and the disallowance of start-up and organizational expenses amortization (pursuant to sections 195 and 248, respectively). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the relevant years, and all Rule references are to the Tax Court Rules of Practice and Procedure. By virtue of the fact that Cabintaxi filed S corporation returns for 1984 and 1985, it is subject to the S corporation audit and litigation procedures contained in sections 6241-6245. The issues for decision are: (1) Whether Cabintaxi's election to be taxed as an S corporation pursuant to section 1362 for 1984 and 1985 is valid; (2) whether Cabintaxi is entitled to deductions pursuant to section 162(a) for 1984 and 1985; (3) whether Cabintaxi is entitled to amortize start-up expenses pursuant to section 195 for 1984 and 1985; and (4) whether Cabintaxi is entitled to amortize organizational costs pursuant to section 248 for 1984 and 1985. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time *325 the petition was filed Cabintaxi was a corporation with its tax matters person having a mailing address of 155 N. Harbor Drive, Unit 2813, Chicago, Illinois 60601. Robert W. Edler (Edler) is the properly designated tax matters person for purposes of this litigation. Cabintaxi was examined under the partnership and S corporation audit procedures. The notices of final S corporation administrative adjustment (FSAA) that form the basis of this case were mailed to petitioner on September 16, 1992. Background
E. Henry Lamkin, Jr. (Lamkin) is a medical doctor who practiced medicine on a part-time basis from 1966 until 1985. Lamkin formed and ran a small publishing company from 1966 until 1991. Lamkin was also a partner in a home health care business from 1983 through 1985. In addition to his professional and business careers, Lamkin also served in the Indiana General Assembly from 1966 until 1982. Lamkin served as Chairman of the Public Safety Committee during his first term. Throughout his General Assembly tenure Lamkin served on several transportation-related commissions and committees and assisted in passing legislation related to public transportation issues. It was *326 through his work with the various commissions and committees that Lamkin became aware that the City of Indianapolis was interested in developing two public transportation projects, one of which conceptualized utilizing an "automated transit system". An automated transit system provides origin-to-destination service without intermediate stops. The cars are computer-programmed, which eliminates the need for drivers. The cars are deployed on a grid system and are electrically powered. The cars used in an automated system generally hold from one to four passengers. A passenger's ticket contains information relevant to the passenger's origin and destination stations. This information is fed into the computer which deploys a car to pick up the passenger, and programs the car to deliver the passenger by using the most expeditious route through the grid system. Lamkin considered the Indianapolis projects as an opportunity to continue to serve the people of Indiana and to make a profit for himself by pursuing them from a business perspective instead of from a political perspective. In 1980, in an effort to take advantage of the perceived opportunity, Lamkin resigned from each of his *327 transportation-related commissions and announced that he would not seek re-election in 1982. At about the same time, Lamkin decided to form Cabintaxi. Lamkin consulted Edler, a corporate attorney, and Lamkin's brother-in-law at that time, and incorporated Cabintaxi under Delaware law on July 17, 1981, as "Automated Transit, Inc." Cabintaxi's name was later changed to "Cabintaxi Corporation". Cabintaxi was formed for the stated purpose of selling, building, installing, and maintaining an automated transportation system. Cabintaxi was organized with 10,000 shares of authorized stock. Lamkin was issued 5,000 shares on July 17, 1981, and at that time he was the sole shareholder. On July 17, 1981, Cabintaxi's Board of Directors consisted of two individuals, Lamkin and Edler. For the next two years, Cabintaxi, mainly through Lamkin's efforts, investigated opportunities for creating and deploying automated transit systems. Initially, Lamkin had hoped to form an alliance with an individual who was developing an automated transportation system. It was only after lengthy meetings with this individual that Lamkin realized that no alliance would be formed. When this attempted alliance *328 failed, Lamkin began to consider restructuring Cabintaxi. In August of 1983, Lamkin and Edler met with Richard D. Doyle (Doyle) and Jack H. Irving (Irving) about the restructuring. Lamkin and Doyle had previously worked together on transportation issues while both were serving in the Indiana General Assembly. Lamkin and Irving met through their involvement with the Advanced Transit Association Board. The individuals agreed that Cabintaxi should continue to pursue the Indianapolis projects and that Doyle, Irving, and Edler would become shareholders of Cabintaxi. On August 15, 1983, resolutions were adopted by Cabintaxi's shareholder (Lamkin) and Board of Directors (Lamkin and Edler) to increase the number of directors from two to four. Lamkin and Edler were to continue as directors, and Doyle and Irving were to become the two new directors. On August 15, 1983, the following preambles and resolutions were adopted by Cabintaxi's shareholder (Lamkin) and Board of Directors (Lamkin, Edler, Doyle, and Irving). We, the undersigned, being the sole stockholder and all of the directors of Automated Transit, Inc., a Delaware corporation, pursuant to Sections 141(f) and 228 of the General *329 Corporation Law of the State of Delaware, do hereby consent to the adoption of, and do hereby adopt, the following resolutions: WHEREAS, it is deemed to be in the best interest of this corporation to increase the total number of shares of stock that this corporation is authorized to issue; and WHEREAS, it is deemed to be in the best interest of this corporation to offer and sell 145,000 shares of common stock of this corporation. NOW, THEREFORE, BE IT RESOLVED, that Article Fourth of the Certificate of Incorporation of this corporation be amended to read as follows: "FOURTH: The total number of shares of stock that the corporation is authorized to issue is one million (1,000,000) shares, all classified as Common Stock with a par value of ten cents ($ .10) per share." FURTHER RESOLVED, that 145,000 shares of common stock of this corporation be issued and sold to the following directors and officers of this corporation at a price of ten cents per share ($ .10). Number of
Total
Shareholder
Shares
Price
E.H. Lamkin, Jr., M.D.
43,750
$ 4,375
Jack H. Irving
48,750
4,875
Richard D. Doyle
37,500
3,750
Robert W. Edler
15,000
1,500
FURTHER RESOLVED, that additional *330 shares of common stock of this corporation shall be issued to each of the foregoing shareholders at a price of $ .10 (ten cents) per share to the extent of any additional cash contributed by them to the capital of this corporation, provided that the total number of shares to be so issued and sold for cash shall not exceed 500,000 without further authorization by this board of directors. FURTHER RESOLVED, that all of the above shares of stock, when issued, shall be fully paid and non-assessable. FURTHER RESOLVED, that all stock of this corporation issued for cash or property shall be Section 1244 Stock as defined by the Internal Revenue Code, as amended. FURTHER RESOLVED, that the proper directors and officers of this corporation be, and they hereby are, authorized and directed to execute in the name of and on behalf of this corporation a Certificate of Amendment to the Certificate of Incorporation and such other documents as shall be necessary and proper to carry out the intent and purpose of the foregoing resolution and to take all other actions and incur expenses and costs which the officers in their sole discretion shall deem reasonable, necessary and proper to carry out the *331 intent and purpose of the foregoing resolutions.
Cabintaxi did not enter into formal written subscription agreements for the shares of stock with any of the four individuals. There was an understanding among the individuals that each would begin to make payments as they were able. On October 11, 1983, Cabintaxi filed a Certificate of Amendment to the Certificate of Incorporation with the Delaware Secretary of State increasing the authorized shares of Cabintaxi to 1,000,000. On November 11, 1983, Lamkin executed Form 2553, Election by a Small Business Corporation, on Cabintaxi's behalf with a stated effective date of January 1, 1984. Form 2553 listed Lamkin as its sole shareholder. Respondent received the form on November 22, 1983, and accepted and filed it on January 25, 1984. Irving purchased his stock through a series of four installment payments as follows: July 14, 1983, $ 1,625; August 19, 1983, $ 1,625; March 17, 1984, $ 812.50; and March 28, 1984, $ 812.50. The record does not indicate how or when the other three individuals paid for their stock but each had paid for at least part of his stock by the time the Form 2553 was signed and filed. The stock certificates *332 for the additional 145,000 shares of stock were dated on March 1, 1984. Cabintaxi's restructuring plans included forming an alliance with a German company that had developed an automated transit system. Sometime in the fall of 1983, Cabintaxi began an association with Messerschmitt-Bolkow-Blohm (MBB) a German company. MBB working in conjunction with Mannesmann Demag Fordertechnik (Demag) developed an automated transit system known as the Cabintaxi System (Cabintaxi) and the Cabinlift System (Cabinlift) (collectively, the System) for the Ministry of Research and Technology of the Federal Republic of Germany (Germany) in the early 1970s. Cabintaxi is similar to a commuter rail system. Cabinlift is similar to a commuter rail system. Cabinlift is similar to a horizontal elevator. MBB had developed the passenger vehicles as well as the guidance and control systems. Demag had developed the overhead steel guideway. Although Cabintaxi was developed and tested, it was never actually placed in service. A Cabinlift has been operating at a hospital in Ziegenhain, Germany, since 1976. Cabintaxi and MBB's association resulted, on February 9, 1984, in MBB authorizing Cabintaxi to market *333 the System within the United States and Canada. Cabintaxi wanted ultimately to purchase the System, and to this end it entered into negotiations with MBB on February 9, 1984. On August 1, 1985, Cabintaxi and MBB entered into a Sale and Cooperation Agreement, wherein MBB, having acquired all rights to the System from Demag, would sell all of its ownership rights in the System to Cabintaxi, while retaining some licensing rights. Cabintaxi failed to make any payments under the contract and subsequently lost it. Cabintaxi attempted to sell Cabintaxi to the City of Indianapolis throughout 1984 and 1985. Although the City was interested in Cabintaxi, Cabintaxi was unable to sell it to the City during 1984 and 1985. Throughout 1984 and 1985, Cabintaxi's officers pursued many leads for potential automated transportation projects in America. Cabintaxi did not maintain an office; instead its officers worked out of their offices and homes and remained in telephone contact with one another. Cabintaxi's Forms 1120S did not include a deduction for wages or salaries in either 1984 or 1985. Leads were pursued at the Mayo Clinic, the Cleveland Clinic, and the Indiana University Medical Center. *334 The officers also pursued leads at La Guardia airport, the St. Louis airport, and at Boeing Corporation. Other leads were pursued with the Cities of Cincinnati, Denver, Los Angeles, Atlanta, Ft. Lauderdale, South Bend and Rosemont, Illinois. None of these leads resulted in Cabintaxi's selling, building, installing, or maintaining an automated transportation system in 1984 or 1985. As a part of its marketing effort, Cabintaxi utilized an expensive multi-media presentation which included two slide projectors, a movie projector and a sound system, all regulated by computer. Cabintaxi engaged Showmasters of Indianapolis to prepare the presentation and to run it each time it was shown. Neither Cabintaxi's 1984 nor 1985 Form 1120S reflected a deduction for the expenses relating to Showmasters. Sometime in 1985, Marsden Burger (Burger) became a shareholder of Cabintaxi. Burger had previously worked approximately 20 years in the mass transportation field and had previously worked on the System for Demag. In July 1985, a financial arrangement was reached between MBB, Cabintaxi, and Burger whereby Burger would work for Cabintaxi marketing the System, and MBB would underwrite Burger's *335 salary. On August 1, 1985, Burger was elected Cabintaxi's president and one of its directors. Sometime in 1985, Gregory Holcombe (Holcombe) became associated with Cabintaxi and served as Assistant to the President. For its 1981 and 1982 tax years, Cabintaxi did not file any Federal income tax returns. For its 1983 tax year, Cabintaxi filed a Form 1120, U.S. Corporation Income Tax Return, on June 25, 1984. Cabintaxi reported no income and no deductions. On Schedule L, Balance Sheets, Cabintaxi listed its capital stock at the beginning of 1983 as $ 500. Cabintaxi listed its capital stock at the end of 1983 as $ 10,150. For its 1984 tax year, Cabintaxi filed a Form 1120S, U.S. Income Tax Return for an S Corporation, on September 20, 1985. On Schedule L, Balance Sheets, Cabintaxi listed its capital stock at the beginning of the year as $ 10,150. Cabintaxi listed its capital stock at the end of the year as $ 25,400. Attached to Cabintaxi's 1984 Form 1120S were two statements labeled "Statement 1" and "Statement 2." Statement 1 listed Cabintaxi's deductions taken on line 22 of its Form 1120S. Cabintaxi's deductions were as follows: Franchise Tax
$   55.45
Travel
8,257.74
Telephone
1,704.85
Replication & Postage
2,551,53
Legal Fees
1,550.25
Miscellaneous
1,235.75
Subscriptions [sic]
45.00
Amortization of Start-up Costs
1,776.60
Total Deductions
$ 17,177.17
*336 Statement 2 constituted Cabintaxi's election to amortize its organizational expenses pursuant to section 248 and its start-up expenses pursuant to section 195. Cabintaxi's return stated that Cabintaxi's business began in January, 1984. Cabintaxi listed the following amounts as organizational expenditures: Incorporation Costs
1982
$   294.25
Incorporation Costs
1983
220.85
Legal Expenses
1983
871.47
$ 1,386.57
Cabintaxi listed the following amounts as start-up expenditures: Franchise Tax
1982
$   64.79
Franchise Tax
1983
132.71
Travel
1983
5,025.65
Telephone
1983
1,406.72
Postage &
Reproduction
1983
653.92
Misc. Expenses
1982
22.52
Misc. Expenses
1983
190.02
$ 7,496.33
Total Start-up &  Organization Expenses
$ 8,882.90
Cabintaxi elected to amortize its total organizational costs and start-up expenditures of $ 8,882.90 over 60 months, which resulted in Cabintaxi's amortizing $ 1,776.60 in 1984. This amount was shown on Cabintaxi's Statement 1 as "Amortization of Start-up Costs" with no indication that the amount also included amortized organizational costs. In 1984, Cabintaxi reported no income and claimed deductions totaling *337 $ 17,177.17 which resulted in a loss of the same amount. This loss was distributed among Cabintaxi's shareholders as reported on Schedules K-1 attached to Cabintaxi's 1984 Form 1120S. The Schedules K-1 reflected the following percentage of ownership: Lamkin
32.5 percent
Irving
32.5 percent
Doyle
25 percent
Edler
10 percent
Cabintaxi's stock record book listed Irving's stock as being issued to Jack H. Irving and Florence Irving, Husband and Wife as community property. The stock record book listed Doyle's stock as being issued to Richard D. Doyle and Nancy E. Doyle, as joint tenants with right of survivorship. Respondent's FSAA dated September 16, 1992, disallowed Cabintaxi's claimed deductions of $ 17,177.17 for 1984. The FSAA listed two reasons for the disallowance; namely, (1) Cabintaxi was not engaged in a trade or business in 1984, and (2) all expenditures made by Cabintaxi in 1984 were nondeductible preopening expenses. Respondent also disallowed Cabintaxi's distribution of its loss to its shareholders, stating that Cabintaxi did not make a valid election to be taxed as an S corporation in 1984. For its 1985 tax year, Cabintaxi filed Form 1120S on March 19, *338 1986. On Schedule L, Balance Sheets, Cabintaxi listed its capital stock at the beginning of the year as $ 25,400. Cabintaxi listed its capital stock at the end of the year as $ 41,925. Attached to Cabintaxi's 1985 Form 1120S was "Statement 1", which listed Cabintaxi's deductions taken on line 22 of the form. Cabintaxi's deductions were as follows: Franchise Tax
$   20.72
Travel
9,248.62
Telephone
1,683.33
Postage
687.28
Legal Fees
2,769.63
Miscellaneous
1,149.86
Republication
692.81
Secretarial Services
1,016.00
Amortization of Org. &
Start-up Costs
1,776.60
$ 19,044.85
In 1985, Cabintaxi reported no income and claimed total deductions of $ 19,044.85 which resulted in a loss of the same amount. This loss was distributed among Cabintaxi's shareholders as reported on Schedules K-1 attached to Cabintaxi's 1985 Form 1120S. The Schedules K-1 reflect the following percentage of ownership: Lamkin
26 percent
Irving
26 percent
Doyle
20 percent
Burger
20 percent
Edler
4 percent
Nancy Edler
4 percent
Respondent's FSAA dated September 16, 1992, disallowed Cabintaxi's claimed deductions of $ 19,044.85 for 1985. The FSAA listed two reasons for the disallowance; *339 namely, (1) Cabintaxi was not engaged in a trade or business in 1985, and (2) all expenditures made by Cabintaxi in 1985 were non-deductible pre-opening expenses. Respondent also disallowed Cabintaxi's distribution of its loss to its shareholders, stating that Cabintaxi did not make a valid election to be taxed as an S corporation in 1985. OPINION We begin by considering whether Cabintaxi's election to be taxed as an S corporation in 1984 and 1985 is valid. The provisions of subchapter S were enacted in 1958 for the purpose of allowing businesses to select their legal forms free of undue tax influence. Technical Amendments Act of 1958, Pub. L. 85-866, 72 Stat . 1606; S. Rept. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 922, 1008. Subchapter S (sections 1361 through 1379) allows a small business corporation to elect to be exempt from corporate income taxes with the corporation's earnings and losses being passed through to its shareholders. Thus it is the shareholders who bear the responsibility of the corporation's income tax consequences. Congress mandated that each shareholder must manifest his assent to assume this responsibility by consenting *340 to the corporation's election to be treated as a subchapter S corporation. Sec. 1362(a). In 1983, section 1362(a) provided in pertinent part: (1) In general.-- * * * a small business corporation may elect, in accordance with the provisions of this section, to be an S corporation. (2) All shareholders must consent to election. -- An election under this subsection shall be valid only if all persons who are shareholders in such corporation on the day on which such election is made consent to such election.
In the instant case, petitioner and respondent disagree over whether all of Cabintaxi's shareholders consented to its subchapter S election. Petitioner's principal argument is that from July 17, 1981, until March 1, 1984, Lamkin was Cabintaxi's sole shareholder and only his consent was necessary to the election that was made on November 11, 1983. Petitioner argues that even though Lamkin, Irving, Doyle, and Edler had begun to make installment payments toward the purchase of their respective portions of the additional 145,000 shares of stock prior to November 11, 1983, Irving, Doyle, and Edler did not become shareholders until March 1, 1984, when Cabintaxi entered them in *341 the corporate stock record book. Petitioner cites Mead Corp. v. Commissioner, 116 F.2d 187 (3d Cir. 1940), revg. 38 B.T.A. 687 (1938), and Pacific National Bank v. Eaton, 141 U.S. 227 (1891), to support its position. Neither case cited by petitioner is apposite. In Mead Corp. the appellate court rejected the Commissioner's attempt to impute ownership of a wholly owned subsidiary to the shareholders of the parent for purposes of the surtax imposed upon certain individuals by section 12(a) of the Revenue Act of 1928, ch. 852, tit. I, 45 Stat. 791. Pacific National Bank held that a shareholder of a bank could not avoid the status of "shareholder" simply by failing to call for and obtain the stock certificate being held for her by the bank. Each case contains a reference to "record owner", which petitioner seizes upon out of context, but which has no relevance to petitioner's position in this case. Neither party denies that Lamkin, Irving, Doyle, and Edler had each paid at least part of the purchase price of the stock to which he was entitled by November 11, 1983, the date on which Lamkin *342 alone signed the subchapter S consent form which was filed with and accepted by the IRS. But petitioner argues that because the names of Irving, Doyle, and Edler were not entered upon Cabintaxi's stock record book until March 1, 1984, they were not shareholders until that time, and consequently were not required to sign consents. We do not believe that the requirements of section 1362 can be avoided by the simple expedient of not issuing stock certificates or entering the names of persons otherwise entitled to stock in the stock record book. As reflected in our findings of fact, Schedule L, Balance Sheets, of Cabintaxi's Form 1120S for 1983 reflected capital of $ 500 at the beginning of the year and $ 10,150 at the close of the year. Since the additional shares to which Lamkin was entitled by virtue of a resolution adopted by the board of directors on August 15, 1983, were to cost him $ 4,375, the additional capital obviously came from the other shareholders. To the extent, at least, that the shareholders other than Lamkin had made capital contributions to Cabintaxi at the time Lamkin signed the Consent, they were equity owners at that time whether or not stock certificates had *343 actually been issued to them. In addition, we note that petitioner's position that Lamkin was Cabintaxi's only shareholder until March 1, 1984, is inconsistent with the Schedules K-1 attached to Cabintaxi's 1984 Form 1120S. Section 1377(a)(1) provides that a shareholder's pro rata share of S corporation items is to be determined by assigning an equal portion of such items to each day of the taxable year and then pro rating each day's amount to the shares outstanding on such day. In order to effectuate this requirement, the instructions to the 1984 Form 1120S require that the Schedules K-1 show each shareholder's "weighted" percentage stock holding during the taxable year. These percentages are used to allocate the S corporation items among the shareholders. The instructions provide a clear method for determining this weighted percentage. The ownership percentages shown on the Schedules K-1 prepared by Cabintaxi for 1984 equal the ownership percentages in the corporation after the acquisition by Lamkin, Irving, Doyle, and Elder of the 145,000 shares referenced in the August 15, 1983 resolution. This reporting is only consistent with the additional shares having been outstanding *344 as of January 1, 1984, and contradicts petitioner's argument that Lamkin was Cabintaxi's only shareholder until March 1, 1984. Further, the record provides no indication that the acquisition of these shares occurred between November 11, 1983 and January 1, 1984; additional evidence that Irving, Doyle and Elder were shareholders as of the date Lamkin executed the Form 2553 election. Section 1362(a) provides that an "election * * * shall be valid only if all persons who are shareholders * * * on the day on which such election is made consent to such election." Moreover, the regulations provided that the consent statement "shall set forth the name and address of the corporation and of the shareholder, the number of shares of stock owned by him, and the date (or dates) on which such stock was acquired." Sec. 1.1372-3(a), Income Tax Regs. (as in effect for 1983). Since in this case there was more than one person entitled to shares in Cabintaxi, and since only one such person signed the consent form as a shareholder, Cabintaxi's Form 2553 was fatally incomplete since it lacked the consent of all the shareholders to the subchapter S election. As we stated in Fratantonio v. Commissioner, T.C. Memo. 1988-158, *345 we are bound by long-standing precedent in this area. To be effective, an election must be both timely and in strict compliance with statutory and regulatory requirements. Cabintaxi's election, while timely, was not in compliance, strict or otherwise, with the statute and regulations as to the consents of the shareholders. The Court of Appeals for the Ninth Circuit considered the issue under discussion in Kean v. Commissioner, 469 F.2d 1183 (9th Cir. 1972), revg. on another issue and remanding 51 T.C. 337 (1968). In Kean, the Court of Appeals held that where brothers had jointly invested in corporate stock but the stock was taken only in the name of one of the brothers, the brothers were both shareholders for purposes of consenting to the subchapter S election, and the failure of the brother who was not a record shareholder to file a consent invalidated the election. Id. at 1187. The Court pointed out that if a subchapter S election is made, the corporation is exempt from corporate taxes, and the shareholders may deduct corporate net operating losses but must pay personal income tax *346 on all corporate income whether distributed or not. The final determination of whether there is to be an election should be made by those who would suffer the tax consequences of it. Therefore, "shareholders" who must file a consent are not necessarily "shareholders of record" but rather beneficial owners of shares "who would have to include in gross income dividends distributed with respect to the stock of the corporation." Id. at 1187 (quoting sec. 1.1371-1(d)(1), Income Tax Regs.). We think the individuals in this case who had made a substantial investment in Cabintaxi at the time the consent was filed by Lamkin fall within the concept of "shareholder" articulated by the Court of Appeals in Kean. In addition, in this case, as in Kean v. Commissioner, supra at 1185, the allocation of corporate losses among individuals is inconsistent with a finding that the corporation's only shareholders were the shareholders of record. For the foregoing reasons, we hold that there was no valid subchapter S election. Cabintaxi's 1984 return states that Cabintaxi's business began in January, 1984. On its 1984 and 1985 returns, *347 Cabintaxi claims three classes of deductions: (1) Trade or business expenses under section 162(a); (2) deductions for amortization of start-up expenditures under section 195; and (3) deductions for amortization of organization expenditures under section 248. Petitioner makes only a single overall argument to support its contention that Cabintaxi is entitled to deductions pursuant to sections 162(a), 195 and 248; namely, that Cabintaxi was carrying on a trade or business in 1984 and 1985. Petitioner argues that Cabintaxi was carrying on a trade or business because (1) its activities were carried on for profit, (2) it devoted substantial time to its activities, (3) it had the authority to sell the Cabintaxi System, and (4) the Cabintaxi System was a fully developed product ready to be sold. Like petitioner, respondent makes only one argument in support of disallowance of Cabintaxi's claimed deductions under sections 162(a), 195 and 248; namely, that Cabintaxi was not carrying on a trade or business in either 1984 or 1985. Respondent maintains that all of Cabintaxi's activities during those years were merely preliminary to the commencement of a trade or business. Neither party *348 attempts to draw any distinction between "beginning with the month in which the active trade or business begins", in section 195(b)(1), "beginning with the month in which the corporation begins business", in section 248(a), and the general concept of when the "carrying on any trade or business" under section 162(a) actually begins. We therefore proceed to an investigation of whether, under section 162(a), Cabintaxi was engaged in carrying on any trade or business during the years in question. Expenses may be deducted under section 162(a) if they are (1) incurred in carrying on a trade or business, (2) ordinary and necessary, and (3) paid or incurred within the taxable year. The inquiry as to whether a taxpayer is carrying on a trade or business is dependent on the facts and circumstances of each case. Commissioner v. Groetzinger, 480 U.S. 23, 36 (1987). In McManus v. Commissioner, T.C. Memo. 1987-457, affd. without opinion 865 F.2d 255 (4th Cir. 1988), we set forth three criteria that are generally accepted as indicative of carrying on a trade or business, and we repeat them here. First, *349 the taxpayer must undertake an activity intending to make a profit. Second, the taxpayer must be regularly and actively involved in the activity. Third, the taxpayer's business operations must actually have commenced. Respondent maintains in this case that Cabintaxi's activities were merely preliminary to the commencement of a trade or business, and that during 1984 and 1985 Cabintaxi's business operations had not actually commenced. Respondent does not, however, contend that Cabintaxi lacked a profit motive. In Madison Gas & Elec. Co. v. Commissioner, 633 F.2d 512, 517 (7th Cir. 1980) affg. 72 T.C. 521 (1979), the Court of Appeals for the Seventh Circuit (the Court to which an appeal of this case would normally lie) affirmed the application of the principles set forth in Richmond Tel. Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated per curiam on other grounds 382 U.S. 68 (1965), for determining when a business begins for purposes of section 162(a). Richmond Tel. Corp. holds that even though a taxpayer has made a firm decision to enter *350 into business and over a considerable period of time spent money in preparation for entering that business, he still has not "engaged in carrying on any trade or business" within the intendment of section 162(a) until such time as the business has begun to function as a going concern and performed those activities for which it was organized. [Id. at 907; fn. ref. omitted.]
At trial, petitioner called Marsden Burger to testify as a mass transportation industry expert. Burger testified that the mass transportation industry had undergone a metamorphosis in recent years due to advancing technology. In earlier years, a purchasing entity, usually a governmental entity, would design the mass transportation system it needed and then enter the marketplace to purchase the system. However, many purchasers began to find that they no longer had the expertise required to keep abreast of the technological advancements. In an effort to utilize mass transportation systems employing the latest technology, according to Burger, purchasers have begun to take a turnkey approach to developing and implementing mass transportation systems. He described the turnkey *351 approach as one in which the suppliers directly approach the purchasers in an attempt to convince them that the supplier's technology will meet the purchaser's needs. Once a purchaser chooses a turnkey supplier, the supplier not only provides the technology for the mass transportation system, but also functions as overseer of the construction and its implementation. Burger also testified that the marketing phase can be accomplished with a minimum of personnel, and that additional personnel are only added once the project begins. He further testified that "the project is the most important thing. * * * of the 80 or 90 transportation projects that get started, maybe five or six are ever completed. So that is why that project was so important. A real project is extremely important." During 1984 and 1985 Cabintaxi spent many hours attempting to market the System and pursuing leads that might produce a project. Cabintaxi proposed the Cabintaxi system to the City of Indianapolis, which was Cabintaxi's most promising potential client. However, in spite of Cabintaxi's efforts during 1984 and 1985, it was never able to obtain a single project; therefore, it did not sell, build, install, *352 or maintain an automated transportation system. Applying the rationale of Richmond Tel. Corp. v. United States, supra, to this case, we conclude that in 1984 and 1985, Cabintaxi's business had not yet commenced, since it had not yet begun to function as a going concern performing any of the activities for which it was organized; namely, selling, building, installing and maintaining an automated transportation system. Since Cabintaxi's business had not commenced in either 1984 or 1985, it was not in those years carrying on a trade or business and therefore was not entitled to deduct expenses under section 162(a), which would include the amortization of start-up expenditures under section 195 and organizational expenditures under section 248. Petitioner relies heavily upon Snyder v. United States, 674 F.2d 1359 (10th Cir. 1982), to support its argument that Cabintaxi was carrying on a trade or business during 1984 and 1985. Petitioner has picked out isolated statements from Snyder and put them ogether into a pastiche of tests which it claims Cabintaxi has met. In Snyder, the questions (which the Court of *353 Appeals did not decide because of inadequate findings of fact below) were whether an attorney who had written photography books was engaged in the trade or business of being an author and entitled to currently deduct his costs, or was pursuing a hobby. Snyder also raised the subsidiary question of whether such costs, even though incurred in a profit-making endeavor, had to be capitalized rather than deducted currently. In the case before us, the start-up expenditures under section 195, and the organizational expenses under section 248, are expenditures that must be capitalized and might be amortized under appropriate circumstances, but again, the carrying on of a trade or business threshold must first have been reached before amortization deductions may commence. As we have held, that threshold was not reached in 1984 and 1985. (We note in passing that Snyder's approach to an author's expenses was obliquely criticized by the Court of Appeals for the Seventh Circuit in Encyclopaedia Britannica, Inc. v. Commissioner, 685 F.2d 212, 215-216 (7th Cir. 1982), revg. and remanding T.C. Memo. 1981-255.) For the foregoing *354 reasons, Decision will be entered for respondent.