CABINTAXI CORPORATION, formerly known as Automated Transit, Incorporated, and Robert Edler, "tax matters person," Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 94–3862.

United States Court of Appeals, Seventh Circuit.

Argued May 8, 1995.

Decided Aug. 17, 1995.

Robert W. Edler (argued), Edler & Christie, Chicago, IL, for petitioners-appellants.

Gary R. Allen, David I. Pincus, Linda A. Mosakowski (argued), Frank P. Cihlar, Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for respondent-appellee.

Before POSNER, Chief Judge, and EASTERBROOK and KANNE, Circuit Judges.

POSNER, Chief Judge.

Subchapter S of the Internal Revenue Code entitles certain corporations to elect to be taxed almost (though not quite: see 26 U.S.C. § 1371(a)(1), and compare 26 U.S.C. § 731 with 26 U.S.C. § 311(b)) as if they were partnerships. The Subchapter S corporation's profits and losses flow through to the shareholders and are reported on their individual income tax returns, 26 U.S.C. § 1366, thus avoiding double taxation of corporate earnings. The election, however, requires the consent of all persons who are shareholders on the date of the election, 26 U.S.C. § 1362(a)(2), which in the case of Cabintaxi Corporation was November 11, 1983. An extension of time for making the election is possible if the original election failed because a shareholder had not consented, Treas.Reg. § 1.1362–6(b)(3)(iii) (superseding Treas.Reg. § 1.1372–3(c), which was in force back in 1983); *Kean v. Commissioner*, 469 F.2d 1183, 1188–89 (9th Cir.1972), but Cabintaxi did not get around to asking for the extension until 1995. The Internal Revenue Service refused to grant it, both because of the eleven-year delay in asking for it and because in the interim Cabintaxi had acquired foreign shareholders, making it ineligible for Subchapter S status. 26 U.S.C. § 1361(b)(1)(C). This would not matter if—this is the first issue in the case—Cabintaxi acquired that status back in 1983, for it had no foreign shareholders either then or, later, when it incurred the losses that it seeks to pass through to its shareholders. The validity of the denial of the requested extension is not before us.

The Tax Court, finding the requirement of unanimous consent not satisfied, refused to allow Cabintaxi to pass through to its four shareholders the $17,000 loss that it sustained in 1984 and the $19,000 loss that it sustained the following year. Only one of the four had signed the consent form by the election date. Nor would the court allow Cabintaxi to deduct these losses on its own income tax return, because the court found

that Cabintaxi had not been engaged in a trade or business during those two years. 68 T.C.M. (CCH) 49, 1994 WL 327740 (T.C. 1994). Cabintaxi challenges both rulings, although the second is germane only if the first is upheld—and even if it is, might appear to be moot because Cabintaxi has never had a profit from which to deduct a loss. Business losses can be carried forward for up to 15 years, however. 26 U.S.C. § 172(b)(1)(A)(ii). So the possibility of Cabintaxi's deducting losses that it incurred in 1984 and 1985 will not expire until 1999 and 2000, and Cabintaxi may have some profits by then from which to deduct the losses, or be able to use the losses in a merger. 26 U.S.C. § 381(a), (c)(1).

The facts relating to the Subchapter S election are simple and uncontested. On August 13, 1983, Cabintaxi had just one shareholder, its founder Lamkin, who owned 5,000 shares, and two directors, Lamkin and the corporation's "tax matters person," petitioner Edler. (A "tax matters person," the Subchapter S corporation's counterpart to a partnership's "tax matters partner," 26 U.S.C. § 6231(a)(7), represents the corporation in its dealings with the Internal Revenue Service. See Temp.Treas.Reg. § 301.6224(c)–2T(b)(3) (1987).) The board of directors was enlarged two days later by the addition of two individuals who (along with Lamkin and Edler) wanted to invest in Cabintaxi. The new board voted to issue 145,000 additional shares of stock, at a price of 10¢ per share, to the four directors–43,750 shares to Lamkin, 48,750 to Irving, 37,500 to Doyle, and 15,000 to Edler. There were no written subscription agreements, merely oral understandings that the four investors would pay for the stock as they were able. Irving paid $3,250 of the $4,875 due from him before the election, which was November 11, 1983. The other three also paid some part of the money they owed for their stock by then, though how much the record does not show. No stock certificates were issued to any of the investors, however, other than Lamkin, until March 1, 1984, which was after the election. Until then Lamkin was the only shareholder who had a stock certificate and also the only shareholder listed in the records of the corporation. And he was the only

shareholder to sign the form electing Subchapter S status.

■ Although the Tax Court's analysis of whether Lamkin was the only shareholder on the date of the election (in which event the Subchapter S election was valid) is disjointed and, as we are about to see, startlingly incomplete, the court made one sound point. Because Subchapter S enables a shareholder to deduct corporate expenses (including losses) against his personal income (including his share of any corporate income), the question whether a person was a shareholder on the date of the election to be taxed under Subchapter S is equivalent to the question whether, had there been a valid election, he would have been required to report as personal income profits earned by the corporation on that date. Treas.Reg. § 1.1371–1(d)(1) (as amended in 1983); *Kean v. Commissioner, supra,* 469 F.2d at 1187; *Wilson v. Commissioner,* 560 F.2d 687, 689 (5th Cir. 1977). This in turn depends on whether he would have been deemed a beneficial owner of shares in the corporation, entitled therefore to demand from the nominal owner the dividends or any other distributions of earnings on those shares. *Speca v. Commissioner,* 630 F.2d 554, 557 (7th Cir.1980); *Wilson v. Commissioner, supra,* 560 F.2d at 689; *Willie v. Commissioner,* 61 T.C.M. (CCH) 2475, 2480–81, 1991 WL 62488 (T.C.1991); *Hume v. Commissioner,* 56 T.C.M. (CCH) 290, 293, 1988 WL 96764 (T.C.1988) aff'd without opinion, 899 F.2d 1225 (9th Cir.1990). Concretely in this case, it depends on whether, had Cabintaxi shown a profit on November 11, 1983, the three investors (besides Lamkin), each of whom had paid some but not all of the purchase price of his stock, would have had an interest in that profit as earnings on shares beneficially owned by them. If so, they were shareholders and their failure to sign the election form means that Cabintaxi did not become a Subchapter S corporation.

■ Whether the three investors were beneficial owners of shares in Cabintaxi depends in the first instance on the wording of the agreement between the investors and Cabintaxi, and in the second on state contract and corporate law, which might con-

strain the agreement, or fill gaps in it, or do both. For, although the meaning of "shareholder" for purposes of Subchapter S election has been said to be a matter of federal law rather than of state law, *Kean v. Commissioner, supra*, 469 F.2d at 1186, this means only that it is federal law which determines which *kind* of shareholder—namely, beneficial rather than record—is required to elect in order for the corporation to achieve Subchapter S status. Whether a particular investor was a shareholder of that kind—in this case was a beneficial shareholder of Cabintaxi on the date of the election—is an issue of state law. *United States v. National Bank of Commerce*, 472 U.S. 713, 722, 105 S.Ct. 2919, 2925, 86 L.Ed.2d 565 (1985); *Aquilino v. United States*, 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960); *United States v. Denlinger*, 982 F.2d 233, 235 (7th Cir.1992). It is true that a case decided by this court many years ago, *HFG Co. v. Pioneer Publishing Co.*, 162 F.2d 536 (7th Cir.1947), held that whether the beneficial owner of shares is a "shareholder" is a question of federal law; but the question arose in the context of the right to maintain a derivative suit. The court treated it as a procedural question, to be decided by interpretation of Fed.R.Civ.P. 23(b) (now 23.1). Whether this approach was correct or not (it was not, see *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 96–97, 111 S.Ct. 1711, 1716–17, 114 L.Ed.2d 152 (1991); 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1826, pp. 43–45 (2d ed. 1986)), it has no bearing on whether the question should be treated as one of state law when the issue is whether someone is a beneficial owner for purposes of Subchapter S status rather than for the purpose of being allowed to bring a derivative suit. In light of the Supreme Court cases that we have cited, the answer is very plainly "yes."

■ On the issue of what the agreement between Cabintaxi and the investors meant, whether as a matter of simple interpretation or as a matter of contract or corporate law, the trial record, the Tax Court's decision, and the briefs and oral arguments of the parties are essentially a blank. The corporate resolution authorizing the issuance of the 145,000

new shares says nothing about the terms of payment. It does say that when all of the shares have been issued they "shall be fully paid and nonassessable," but all that this boilerplate means is that once they are paid for in full the shareholder (unlike a partner) will not be subject to a demand for additional capital (a capital call), should the corporation need more capital. 13A *Fletcher Cyclopedia of the Law of Private Corporations* § 6589 (permanent ed., Cora M Thompson ed. 1984).

Since the shares were priced at only 10¢ apiece, one might suppose that on election day each of the three latter-day investors owned as many shares as the number of dollars he had paid, multiplied by ten. Alternatively, however, one might suppose that the parties agreed that until the shares were paid for in full none of the investors (except Lamkin of course) would be entitled to any dividends or other distribution of profits. Presumably, until these investors were paid up any profits of the corporation were unlikely to have reflected their contributions, since there is an interval between investing capital and reaping a profit from the activity made possible by the investment.

■ The record is silent on the terms of the oral understanding that authorized and defined the installment method of paying for the shares; nor have the parties informed us of any pertinent gap-filling provisions of state corporate or contract law. Our own research has turned up a provision of Delaware law that authorizes a Delaware corporation (which Cabintaxi is) to issue shares when they have been only partly paid for, and if the corporation subsequently declares a dividend the owners of these shares receive the same fraction of the dividend as the fraction of the purchase price that they have already paid. Del.Code, tit. 8, § 156. But the issue here is not issuance. That did not occur until March 1, when the share certificates were actually delivered to the three new investors. *Graham v. Commercial Credit Co.*, 41 Del.Ch. 580, 200 A.2d 828, 830 (1964); *Smith v. Universal Service Motors Co.*, 17 Del.Ch. 58, 147 A. 247 (1929). Delaware law is clear that status as a shareholder does not depend on the issuance of a certificate of

stock, since the certificate is merely evidence of ownership. *Id.; cf. Richardson v. Shaw,* 209 U.S. 365, 378, 28 S.Ct. 512, 516, 52 L.Ed. 835 (1908); *Lucas v. Lucas,* 946 F.2d 1318, 1323 (8th Cir.1991).

Two Delaware cases do hold that dividends are not earned on stock prior to its issuance; but the cases are readily distinguishable from our case. In *Holland v. National Automotive Fibres, Inc.,* 22 Del.Ch. 99, 194 A. 124, 126 (1937), preferred shareholders had a right to convert their preferred stock to common stock, and the question was whether, until they converted, they were entitled to the dividends on the common stock—along with the dividends they were continuing to receive on the preferred stock because it had not yet been converted. Of course the answer was no. In *Blandin v. United North & South Development Co.,* 36 Del.Ch. 538, 134 A.2d 706, 707–08 (1957), the issue was not conversion, but merely the entitlement of a preferred shareholder to dividends for the period before the preferred stock had been issued (though after it had been authorized). The court was concerned that if there were such an entitlement the corporation would be unable to distribute its earnings to the common shareholders without establishing a reserve for the contingent claims of future preferred shareholders to those earnings.

We conclude that the new investors in Cabintaxi could be beneficial owners without having received the share certificates, and if so they were already shareholders, for purposes of Subchapter S, on the date of the election. But, as we have stressed, there is very little evidence of when these investors became beneficial owners. The Tax Court did point out that when Cabintaxi filed its income tax return for 1984 it listed the four investors as the shareholders to whom the corporation's losses would flow, and the allocation of the losses among them was identical to the allocation of shares in the August 13, 1983, corporate resolution. As of January 1, 1984 (the relevant date if all the investors were to share losses in proportion to their shares, because if the three new investors had become shareholders later in the year, 26 U.S.C. § 1377(a)(1) would have required a reduction in the percentage of losses attrib-

uted to them), the investors had not yet completed paying for their shares. So here is a bit of evidence that the parties' agreement contemplated that the investors would become shareholders before they finished paying for their shares. But it is not decisive. Whoever prepared the corporation's 1984 income tax return could easily have missed the subtle prorating requirement of section 1377(a)(1) and assumed that investors who became shareholders at any time during the year were entitled to share in the year's losses in proportion to their stock ownership.

The question can be recast, in practical terms, as whether the corporation intended in effect to lend the investors a part of the purchase price of their stock, in which event they had full rights as shareholders from the time of the subscription agreements, or whether they were to have no rights until they paid up in full. The answer is not apparent on the record before us, but since the burden of persuasion on entitlement to Subchapter S status rests on the corporation claiming the entitlement, Tax Ct. Rule of Practice 142; *Brutsche v. Commissioner,* 585 F.2d 436, 441 (10th Cir.1978), the burden was Cabintaxi's to present facts that would show that the second interpretation was more likely. It was likewise the corporation's burden—implicit in what we have said and in the related proposition that assessments by the Internal Revenue Service are presumed to be correct, *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933) (Cardozo, J.); *Gold Emporium, Inc. v. Commissioner,* 910 F.2d 1374, 1378 (7th Cir.1990)—to supply the court with the principles of interpretation drawn from the applicable corporate or contract law that would determine what facts would establish the status of these investors. These correlated burdens Cabintaxi failed to carry, and as a result the Tax Court was entitled to hold that the election of Subchapter S status was invalid.

This leaves the second question presented by the appeal, which is whether Cabintaxi, though forbidden to pass its 1984 and 1985 losses through to its shareholders, can retain them as loss carryforwards. It can do this only if the losses were incurred in the

course of a trade or business in which Cabintaxi was engaged in those years.

It may seem obvious that since Cabintaxi is a business corporation it was engaged in a trade or business. But one office of 26 U.S.C. § 162(a), which authorizes the deduction only of "ordinary and necessary expenses" incurred during the taxable year "in carrying on any trade or business," is to disallow the deduction of expenses incurred by a firm before it begins to engage in the business for which it was created—"pre-opening expenses," as they are called in tax-land. *Fishman v. Commissioner*, 837 F.2d 309, 312 (7th Cir.1988); *Sorrell v. Commissioner*, 882 F.2d 484, 486 (11th Cir.1989); *Lewis v. Commissioner*, 861 F.2d 1232, 1233 (10th Cir.1988). Once business operations do begin, the start-up expenses—expenses, such as the cost of acquiring necessary licenses, that are not incurred on a continuous basis, that indeed may be incurred only once in the life of the corporation—must be capitalized before they can be deducted (over time, as a depreciation expense), because they are not intended to produce income only in the first year of operations. 26 U.S.C. §§ 195, 248; see *Fishman v. Commissioner, supra*, 837 F.2d at 312. The purpose of these rules (the second, the requirement of capitalization, more clearly perhaps than the first) is to require the matching of expenses to income temporally, *id.*, a major objective of efficient tax policy. *Newark Morning Ledger Co. v. United States*, —— U.S. ——, ——, 113 S.Ct. 1670, 1680, 123 L.Ed.2d 288 (1993); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 83–84, 112 S.Ct. 1039, 1042–43, 117 L.Ed.2d 226 (1992); *Encyclopaedia Britannica, Inc. v. Commissioner*, 685 F.2d 212, 214 (7th Cir. 1982); *Ellis Banking Corp. v. Commissioner*, 688 F.2d 1376, 1379 (11th Cir.1982). Of course if, as in this case, the expenses are incurred before there is any income to deduct them from, the abuse that the matching policy aims to prevent, that of deferring the realization of taxable income to a later period than the deduction (thus creating an incentive to incur expenses earlier than would be efficient, *Fishman v. Commissioner, supra*, 837 F.2d at 312), will not occur. Cabintaxi will obtain no benefit from the deductibility of the expenses it incurred in 1984 and 1985

until and unless it has income. But a firm that had income from one trade or business could, were it not for the rule that prevents the deduction of expenses incurred before the beginning of operations of the business to which the expenses pertain, deduct those expenses from that income, thus in effect postponing the realization for tax purposes of the income generated by the existing business.

■ The question of capitalization and the question of deductibility, though related, are distinct. Expenses incurred early in the life of a business often are, but need not be, designed to generate income over a period of years, even over the entire life of the enterprise, as we have pointed out. In this case, however, the only expenses sought to be deducted were selling expenses, which, unless they are incurred in connection with the acquisition or disposition of a capital asset, are usually treated as current expenses even when their value is not wholly exhausted in the year in which they are incurred. *Woodward v. Commissioner*, 397 U.S. 572, 575–76, 90 S.Ct. 1302, 1305, 25 L.Ed.2d 577 (1970); *Encyclopaedia Britannica, Inc. v. Commissioner, supra*, 685 F.2d at 217; cf. *Fall River Gas Appliance Co. v. Commissioner*, 349 F.2d 515, 517 (1st Cir.1965); Michael J. Graetz, *Federal Income Taxation: Principles and Policies* 356–60 (2d ed. 1988). The government does not argue that they should have been capitalized and depreciated in this case. It would if it thought they were deductible in any form, but it does not, because it deems them to have been incurred when Cabintaxi was not yet engaged in a trade or business within the meaning of the Code. The applicable Treasury Regulation treats the question when a corporation commences business operations as a question of fact, declining to provide any guidance. Treas. Reg. § 1.248–1(a)(3). We must therefore uphold the Tax Court's finding unless clearly erroneous. *Whipple v. Commissioner*, 373 U.S. 193, 203–04, 83 S.Ct. 1168, 1174–75, 10 L.Ed.2d 288 (1963); *Segal v. Commissioner*, 41 F.3d 1144, 1147 (7th Cir.1994); *Commissioner v. Hendrickson*, 873 F.2d 1018, 1022 (7th Cir.1989).

Lamkin, who in 1980 was an Indiana state legislator specializing in transportation is-

sues, learned that the City of Indianapolis was interested in the possibility of buying what is called an "automated transit system" or a "personal rapid transit" system. Such a system (which at present is operating in the French city of Lille and in Morgantown, West Virginia, and is under consideration by Rosemont, Illinois, a suburb of Chicago—but in none of these operations or proposals is Cabintaxi involved) uses computer technology to create a hybrid of taxi and trolley service. Tom K. Phares, "Convenient Downtown Transit Is Possible," *Pittsburgh Post-Gazette*, Jan. 11, 1995, p. B2; Gary Washburn, "Space–Age Commuting Bound for Rosemont," *Chicago Tribune*, April 16, 1993, p. 1. Electrically powered, computer-controlled, driverless cars, each holding two to four passengers, run on a rail or wire grid laid in the streets. When buying a ticket the passenger indicates his origin and destination, and the system's computer dispatches a car to pick him up and programs the car to deliver him to his destination by the quickest route.

Lamkin formed Cabintaxi in 1981 and left the legislature shortly afterward. The purpose for which the corporation was created, according to the articles of corporation, was the sale, installation, and maintenance of automated transportation systems. A German company had developed such a system in the 1970s, and in 1984 the company formally authorized Cabintaxi to market the system in the United States and Canada. The expenses that Cabintaxi incurred in that and the following year that it wants to deduct were incurred in an effort to sell the German system to Indianapolis and other American cities. All without success.

The Tax Court's reasoning, in denying the deduction, was mechanical. Cabintaxi had been formed to engage in the business of selling, installing, and maintaining automated transit systems. It did not, in the relevant period (1984 and 1985)—or before or after, for that matter—sell, install, or maintain such a system. Therefore it did not engage in the business for which it was formed, and was not entitled to deduct any of its expenses. This reasoning confuses business activity with the purpose of the activity. The

principal purpose for which Cabintaxi was formed was to make money, and to do this it had, since Lamkin did not want to be a consultant, to sell, install, or maintain automated transit systems. But before it could sell, install, or maintain its first system it had to sell the system, and to sell it had to incur selling expenses. Those expenses were an integral part of being in the business of selling automated transit systems.

■ At argument the government rightly conceded that Cabintaxi did not have to succeed, even so far as to have a single penny of income, in order to be engaged in a trade or business. See, e.g., *Jackson v. Commissioner*, 864 F.2d 1521, 1526 n. 7 (10th Cir.1989); *Blitzer v. United States*, 684 F.2d 874, 880, 231 Ct.Cl. 236 (1982) (per curiam); *Malmstedt v. Commissioner*, 578 F.2d 520, 527 (4th Cir.1978). (*Aboussie v. United States*, 779 F.2d 424, 428 (8th Cir.1985), looks the other way, but does not discuss the principles involved or the cases.) No doubt it is unusual for a business to fail so quickly and so utterly as never to have had a single customer, but perhaps it is not so unusual when as in this case the only product sold by the business costs millions of dollars. At all events, it follows from the government's concession that if after signing the distribution agreement with the German manufacturer Cabintaxi had purchased a showroom for the display of a sample system, it could have deducted the cost of that showroom. The venture would in that event have proceeded far beyond the merely organizational stage—the creation of a corporation intended to engage in a business, which is not the same thing as actually engaging in a business. *McManus v. Commissioner*, 54 T.C.M. (CCH) 475, 480–81, 1987 WL 40517 (T.C.1987), aff'd without opinion, 865 F.2d 255, 1988 WL 131827 (4th Cir.1988). An automated transit system is not sold from a showroom, but that can hardly matter. A plausible characterization of the business in which Cabintaxi was engaged is the business of being the U.S. and Canadian distributor of the German company's automated transit system, cf. *Jackson v. Commissioner, supra,* 864 F.2d at 1526—a characterization bolstered by the fact that "Cabintaxi" is in fact the name of the German system. The business of being a dis-

tributor commences with the agreement to distribute the supplier's product, provided that the agreement is followed with reasonable promptitude by bona fide efforts to sell the product, *McManus v. Commissioner, supra,* 54 T.C.M. (CCH) at 481—a condition satisfied here, however.

There is no suggestion that the corporation was simply a hobby of Lamkin's and the expenses that the corporation seeks to deduct personal expenses disguised as business expenses. 26 U.S.C. §§ 183, 262; *United States v. Gilmore,* 372 U.S. 39, 45–46, 83 S.Ct. 623, 627–28, 9 L.Ed.2d 570 (1963). It was a bona fide corporate enterprise actuated by a bona fide business motive. We do not find the Tax Court's ground for rejecting the deduction of these expenses tenable, and we therefore remand the case for reconsideration by that court.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.